UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JUDITH A. JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  4:11CV1381 TIA |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3)for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On March 24, 2009, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI").  (Tr. 101-112)  In her applications, Plaintiff alleged disability beginning February 28, 2007 due to depression, anxiety, epilepsy, diabetes, HTN, and chronic back pain. (Tr. 53, 101, 108)  Plaintiff's applications were denied on April 24, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 51-56, 59-60)  On July 13, 2010, Plaintiff appeared and testified at a hearing in person via video teleconference from St. Louis, Missouri.  (Tr. 28-50)  In a decision dated August 12, 2010, the ALJ determined that Plaintiff had not been under a disability from February 28, 2007 through the date of the decision. (Tr. 16-27) The Appeals Council denied Plaintiff's Request for Review on June 10, 2011.  (Tr. 1-3)  Thus, the

decision of the ALJ stands as the final decision of the Commissioner.

## **II.  Evidence Before the ALJ**

At the hearing before the ALJ, Plaintiff was represented by counsel.  The ALJ held the hearing in Chicago, Illinois, and Plaintiff testified via video conference from St. Louis, Missouri.  In an opening statement, Plaintiff's attorney noted that Plaintiff was 49 years old and had a Bachelors degree in early childhood education.  Most of her background work was clerical in nature.  Her last work attempt was in February 2008 at a local manufacturing company.  Plaintiff left after one week due to her condition.  Plaintiff's attorney further stated that Plaintiff's impairments included major depressive disorder; anxiety disorder; obsessive compulsive disorder; diabetes, not adequately controlled with some physical manifestations; hypertension, controlled; and a history of epilepsy, controlled with medication.  In addition, Plaintiff's doctor assessed chronic, severe back pain but did not perform diagnostic tests because Plaintiff did not previously have health insurance.  (Tr. 32-35)

Upon questioning by the ALJ, Plaintiff testified that she last worked in 2007.  On a typical day, Plaintiff woke up after having a nightmare and sat on the edge of the bed trying to come out of the nightmare, which could take up to 2 hours.  Sometimes she moved to the living room and watched TV. Plaintiff took medication, and her friend helped her fix lunch.  Plaintiff then waited for her husband to return from work.  She testified that she was unable to do any housework.  Her husband and her friend performed the housework, and Plaintiff's husband did all the grocery shopping, laundry, and yard work.  In addition, Plaintiff stated that her medications made her dizzy and sick to her stomach.  (Tr. 35-36)

Plaintiff's attorney also questioned her about her impairments.  With regard to the nightmares, Plaintiff testified that she had the same nightmare every night, which consisted of being happy

working at one of her old jobs and then realizing that she was not working there. In addition, Plaintiff stated that she worked almost a year after earning her Bachelors degree as a teacher for two and three year old children. She left due to panic attacks and seizures. Plaintiff's last steady job was at Sumner Group. She worked there for a year but was let go because she called in sick too many times. Plaintiff's last attempt to work was in February of 2008. She worked as a bookkeeper for Victor Iron Works. Plaintiff testified that she was unable to keep that job due to anxiety and panic. (Tr. 36-39)

Plaintiff also stated that her father drove her and her husband to the hearing. Plaintiff no longer drove for fear of having a seizure behind the wheel. She was able to walk a block or two before getting dizzy. In addition, she had trouble standing in line without a cart to lean on because she became very dizzy from the medication. She could stand for only 10 or 15 minutes. After sitting in a chair for about 15 or 20 minutes, Plaintiff experienced pain in her lower back. Plaintiff did not participate in social activities, and she stated that she was afraid to leave her house because she did not want anyone to see her in her current condition. She specified that she did not want to have a seizure in front of others. She spent Christmas at her parents home but could not go to big family gatherings. (Tr. 39-41)

With regard to her diabetes, Plaintiff testified that she had sores on her legs and arms that would not heal. In addition, her feet would swell, causing days when she was unable to wear shoes. The diabetes medication also made her very sick to her stomach. Her blood sugar level was stable, and she followed a healthy diet. (Tr. 41)

Plaintiff stated that she and her husband used to camp, fish, play pool, and go to friends' houses. She had not performed those activities for at least 3 years. Plaintiff enjoyed watching TV but could not remember what she watched. Plaintiff only slept 3 hours a night because of nightmares.

She did not nap during the day, and she performed no household chores because she became dizzy when walking from room to room. She showered only once every 3 or 4 weeks because she was afraid of having a seizure in the shower or tub. In addition, Plaintiff testified that she suffered from OCD. She explained that she had to do everything in even numbers or she experienced an overwhelming fear that something bad would happen. Plaintiff stated that she had these behaviors her entire life but was able to hide it. In addition, Plaintiff cried when she talked about how sick she had become. She experienced crying spells 2 or 3 times a day while at home. Anything could trigger these crying spells. Plaintiff also had panic attacks 3 to 4 times a day, which included shaking, sweating, and breathing problems and lasted from 20 minutes to 2 hours. Plaintiff did not leave her room for two years, other than to go to the bathroom or get a beverage. Now, she was able to walk into the living room and look out the window. Plaintiff further testified that there were times she wished she wasn't here. She did not want to go to sleep at night or wake in the morning, but she did not want to hurt her parents, husband, and son. (Tr. 41-46)

A vocational expert ("VE"), Melissa Benjamin, also testified at the hearing. The ALJ asked the VE to assume a hypothetical woman who is a younger individual with the same work background as the Plaintiff. The individual's impairments included epilepsy, hypertension, diabetes mellitus, major depressive disorder, anxiety disorder, and obsessive compulsive disorder. These impairments limited her ability to frequent climbing stairs or ramps and no climbing ladders, ropes, or scaffolds. The individual could also frequently balance, stoop, kneel, crouch, and crawl. However, she could have no exposure to heights or moving machinery. The work would be unskilled with brief and superficial contact with others in the work place. In addition, she required no rapid or frequent changes in work routine due to her stress tolerance. Given this hypothetical, the woman would not be able to perform

4

any of Plaintiff's past relevant work because her jobs were semi-skilled, not unskilled. However, the person could work as a cleaner, laundry sorter, and packer, which constituted unskilled, light work. However, if the hypothetical woman was likely to be absent more than twice a month, she would not be employable. (Tr. 47-49)

Plaintiff's attorney then asked the VE to assume the first hypothetical and add poor to no ability to deal with work stresses, maintain attention and concentration, and demonstrate reliability in the work place. With those additional limitations, the individual would be eliminated from competitive employment. (Tr. 49)

In a Disability Report – Adult, Plaintiff stated that she was precluded from working due to depression, anxiety, epilepsy, diabetes, HTN, and chronic back pain. She reported that she had been in bed for 2 years due to depression and anxiety. She had seizures and would wake up in her urine. Her medications made her dizzy, and the seizures caused memory loss. (Tr. 148-49)

Plaintiff completed a Function Report – Adult on April 10, 2009. She stated that her days included waking up sick to her stomach, using the bathroom, taking her medications, and going back to bed to watch TV. She would eat lunch around noon and watch her soap opera in the afternoon. By 2:00 p.m., Plaintiff would sit in the living room chair and watch TV until her husband returned from work and cooked dinner. After dinner, she and her husband would watch movies or talk. Plaintiff then took her medication and went to bed at 10:00 p.m. She sometimes took naps, and she cried a lot. Before her condition, Plaintiff was able to function. She did not sleep well because she stayed awake worrying or crying. Plaintiff stayed in the same clothes for days and did not bathe for days at a time. Her family told her to bathe and brush her teeth, but she did not care anymore. Plaintiff was able to fix lunch every day. She no longer cooked dinner or did household chores

because she was too depressed or dizzy. She went out once a week but did not like to go anywhere alone for fear of having a seizure. Plaintiff did not do any shopping. Her only activities were talking and watching TV. Her conditions affected her memory and concentration. Plaintiff opined that she could walk one city block before needing to rest for 5 to 10 minutes. She followed written instructions very well; followed spoken instructions okay; and got along with authority figures okay. However, she would shut down when handling stress, and she was unable to handle change. Plaintiff was afraid to be seen and afraid that her loved ones would die. (Tr. 160-67)

### III.  Medical Evidence

On January 7, 2007, Plaintiff saw Dr. Steve Nester for complaints of acid reflux, anxiety, diabetes, hypertension, high cholesterol, chronic jaw pain, and back pain. Although the progress notes are difficult to decipher, Dr. Nester recommended that Plaintiff return in 3 months. (Tr. 244) Plaintiff attended a follow up appointments on June 20, 2007 and October 23, 2007. (Tr. 242-43) On two occasions in 2007, Plaintiff requested early refills of vicodin. (Tr. 224, 226)

On March 14, 2008, Dr. Nester evaluated Plaintiff for medication refills. She complained of joint or muscle pain and decreased mobility. (Tr. 241) She returned to Dr. Nester on July 30, 2008 for medication refills and complaints of heart burn and chronic back pain. (Tr. 240)  An email from Dr. Nester sent the following day noted that Plaintiff's overall diabetes control was worse. He recommended that Plaintiff redouble her effort at diet and increase exercise. (Tr. 221) On August 11, 2008, Plaintiff called Dr. Nester's office to request an early refill of vicodin, stating that her medication was stolen. (Tr. 217)

Plaintiff presented to Dr. Nester on November 6, 2008. Her chronic problem list included

type II diabetes, high cholesterol, HTN, chronic severe back pain/jaw pain, and depression. Dr. Nester noted Plaintiff was off medications for a few days since running out. Her blood sugars were better because she recently started taking her medications differently. The physical examination was normal, and specifically Dr. Nester found full range of motion with no obvious deformity when conducting Plaintiff's musculoskeletal exam. He assessed HTN, type II DM, high cholesterol, chronic severe back pain/jaw pain, and depression. (Tr. 238-39)

Plaintiff called Dr. Nester's office on January 14, 2009, stating that she had been taking her medication more than prescribed and requesting an early refill of Hydrocodone. Dr. Nester responded that Plaintiff needed to come in for an appointment to document why she was taking more medication and pursue any new considerations. (Tr. 215) The following day, Plaintiff complained of a recent seizure for which she did not go to the hospital. Plaintiff reported seizures beginning 13 years ago, with another seizure occurring 4 years ago. Plaintiff reported that she was on Dilantin for one year. Dr. Nester noted back pain, poorly controlled. Plaintiff needed to take 6 vicodin per day. He assessed HTN, type II DM, high cholesterol, chronic severe back pain/jaw pain, depression, and seizures. Dr. Nester ordered Plaintiff to begin Dilantin and check back in 2 weeks. (Tr. 236-37) After her appointment, Plaintiff called Dr. Nester again, claiming that the hydrocodone directions of 1 pill every 6 hours should be 1 pill every 4 hours. Dr. Nester clarified that the directions should be 1 to 2 pills every 6 hours. (Tr. 213)

Plaintiff returned to Dr. Nester on February 18, 2009. Plaintiff complained of right arm/shoulder and neck pain for 2 weeks. Review of systems and physical examination were normal. Dr. Nester diagnosed neck pain and seizures. He continued Plaintiff's pain medications, added methocarbomal, and ordered x-rays of her c-spine and shoulder. (Tr. 234-35) In an email exchange

7

the following day, Dr. Nester noted that Plaintiff's dilantin level was lower than therapeutic and requested confirmation that Plaintiff was taking the medication as prescribed.  (Tr. 211)

On June 9, 2009, Plaintiff presented for an appointment to request refills of her pain and anxiety medications.  She also complained of an upper resperatory infection, cough, and congestion. Dr. Nester refilled Plaintiff's medications and recommended that Plaintiff undergo diabetes testing in the next couple months.  (Tr. 318-19) On October 7, 2009, Plaintiff returned to Dr. Nester for a refill of her medication for back pain.  She stated that her depression was not well controlled and that she was unable to work.  Plaintiff requested to see a psychiatrist.  She did not have suicidal ideations. Plaintiff was not exercising, but was taking her medications.  She reported that her seizures were well-controlled with a recent increase in dilantin dosage.  (Tr. 315-17)

On December 15, 2009, Plaintiff saw Dr. Nester for completion of her disability paperwork. She also complained of cold symptoms.  Dr. Nester assessed an upper respiratory infection with cough and prescribed antibiotics and cough medicine.  Dr. Nester also completed a Medical Report Including Physician's Certification/Disability Evaluation.  He noted that he treated Plaintiff on five occasions in 2009.  Her complaints were HTN, type II diabetes, high cholesterol, severe recalcitrant back pain, depression, and seizures.  Dr. Nester noted that Plaintiff had intermittent peripheral edema; depression with anxiety; seizure disorder with 1 to 2 grand mal seizures per year; and back pain with standing, stooping, and lifting.  He opined that Plaintiff had poor functional capacity due to combined medical condition, rendering her permanently disabled.  (Tr. 306-10)

Plaintiff returned to Dr. Nester on February 17, 2010, complaining of cold and indigestion symptoms, reporting frequent exacerbations with back, and requesting refills of dilantin and pain medications.   Her  musculoskeletal  exam  revealed  decreased  range  of  motion  and  paraspinal

8

tenderness. Dr. Nester renewed her medications and advised her to return in 6 months. (Tr. 301-02)

On March 26, 2010, Plaintiff called Dr. Nester's office to report that her roommate stole her hydrocodone and request a refill. (Tr. 296)  She called again on June 9, 2010 to discuss her mental and physical state. (Tr. 294) Dr. Nester examined Plaintiff on June 18, 2010. Plaintiff needed her disability paperwork completed and a refill of medications. Plaintiff's blood pressure was controlled, and she continued to take medication for seizures. She reported that a psychiatrist prescribed effexor and klonopin. Physical examination was normal except for decreased range of motion and paraspinal tenderness during the musculoskeletal exam. Dr. Nester renewed Plaintiff's pain medications and advised her to follow up with her psychiatrist. (Tr. 288-89)

On June 21, 2010, Dr. Nester completed a Physician's Assessment for Social Security Disability Claim.  Plaintiff's diagnoses included HTN, type II diabetes, high cholesterol, depression/anxiety, seizures, and severe back pain. He stated that Plaintiff's medications reduced her ability to concentrate and function. She experienced back pain with sitting, standing, and stooping. Dr. Nester opined that Plaintiff needed to rest 5 hours in an 8 hour workday. In addition, she experienced 1 to 2 major seizures a year, along with minor seizures. Dr. Nester stated that sitting for more than 10 minutes at a time caused increased back pain. He concluded that Plaintiff had been disabled due to her medical conditions and side effects from medications since 2005. (Tr. 286)

On November 9, 2009, Robert H. Brady, M.D., performed an Initial Psychiatric Evaluation. He noted that Plaintiff was a reliable source of information. Plaintiff reported that she struggled with depression most of her life, which had become extremely disruptive over the past few years. She also described significant anxiety, noting that she worried about a variety of issues. She also worried about seizures. Plaintiff reported at least 3 generalized seizures in the past, with the last seizure in

9

January 2009. Plaintiff was afraid of having a seizure in the shower or a store, so she bathed infrequently and did not go out in public. In addition, Plaintiff reported having OCD symptoms since childhood. Plaintiff counted everything in sets of fours and even numbers. Plaintiff used alcohol and illicit drugs when she was younger, but she had not used in many years. Plaintiff stated that she had never seen a psychiatrist but was treated for depression and anxiety by her primary care physician. She had taken Prozac, Ativan, and Effexor, with some success; however, she continued to have significant symptoms. (Tr. 281-82)

Plaintiff further reported that she obtained a master's degree with honors in education. However, she was unable to return to work due to depression and anxiety. During her mental status exam, Plaintiff was very tense, nervous, and appeared tired. Her flow of thought was logical and sequential, and she denied any homicidal or suicidal ideation. Her mood was depressed, and her affect was sad, depressed, tearful, and tense. Plaintiff was alert and oriented times 3, and she expressed herself fairly well and appeared intelligent. Insight and judgment were fair to good. Dr. Brady diagnosed major depressive disorder, recurrent; obsessive-compulsive disorder; rule out generalized anxiety disorder; epilepsy, hypertension; diabetes; hypercholesterolemia; and a GAF of 50. Dr. Brady also prescribed Prozac and Klonopin and advised Plaintiff to return in 2 weeks. (Tr. 282-84)

Plaintiff returned to Dr. Brady on November 30, 2009. She denied any side effects from Prozac, and the drowsiness she initially felt from Klonopin had resolved. Plaintiff remained depressed and reported that her activity was severely limited by anxiety and depressed mood. Dr. Brady recommended that Plaintiff continue her medications and return in 3 weeks. (Tr. 280) On December 21, 2009, Plaintiff reported that her mood seemed better at times. She had gone out every day for

a week and was sleeping better.  Her anxiety was less intense.  Dr. Brady renewed Plaintiff's prescriptions and noted that she planned to set up group therapy.  (Tr. 279)

Plaintiff returned to Dr. Brady on January 25, 2010.  Her overall mood had been better, but she continued to have low energy and motivation, as well as increased worry about the future.  Dr. Brady increased her dose of Prozac and advised her to return in 4 weeks.  (Tr. 278)  On March 1, 2010, Plaintiff reported that her mood and anxiety had worsened and that she felt paralyzed.  She had thoughts of dying and hopelessness, and she cried often.  Dr. Brady changed Plaintiff's medication to Effexor and increased her Klonopin dose.  (Tr. 277) When Plaintiff returned on March 15, 2010, she reported that her mood and anxiety were better.  She was taking a shower once a week, instead of once every 2 to 3 weeks.  (Tr. 276)  Plaintiff also reported improvement on April 12, 2010.  She was more active during the day and had been getting out daily to socialize.  (Tr. 275)  On May 10, 2010, Plaintiff stated that the past month had been a roller coaster with stressors.  However, she had not reverted to severe depression and experienced very few panic attacks.  She was getting out more regularly.  In addition, Plaintiff denied medication side effects.  (Tr. 274)

On June 9, 2010, Dr. Brady completed a Psychiatric Assessment and a Medical Assessment of Ability to Do Work-Related Activities (Mental).  He stated that Plaintiff had poor to no ability to deal with work stresses or be attentive/concentrate.  Her ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, and function independently were fair.  She had poor or no ability to understand, remember, and carry out complex instructions, but her capacity for detailed, but not complex, job instructions was fair.  She had a good ability to carry out simple job instructions.  With regard to making personal-social adjustments, Plaintiff's ability to maintain personal appearance was good; ability to behave in an emotionally stable manner and relate

11

predictably in social situations was fair; and ability to demonstrate reliability was poor. Dr. Brady noted that Plaintiff had longstanding symptoms of major depression, anxiety, and obsessive compulsive disorder which had been debilitating at times, including basic daily functioning at home. Her GAF was 50.  Dr. Brady noted that Plaintiff's condition was improving with medication and therapy.  He further stated that Plaintiff's condition was severe enough since November 2009 to prevent her from working.  She could possibly resume working part time by November 2010, depending on her improvement.  In addition, Dr. Brady noted Plaintiff's reports that her symptoms had been severe for 3 years.  (Tr. 272-73)

On December 7, 2009, Carmen Curtis, Ph.D., performed a consultative psychological examination.  Plaintiff's chief complaints were depression and anxiety.  Dr. Curtis found Plaintiff to be a fair informant.  Plaintiff was casually dressed, with hygiene and grooming within normal limits. Eye contact was good; posture and gait were normal; and she emitted an unpleasant body odor.  Her mood was dysphoric, and her affect was full and generally appropriate.  She was tearful through most of the interview.  Plaintiff's activities of daily living were moderately impaired.  Plaintiff reported being too depressed and dizzy to cook, clean, shop, or do any chores.  Dr. Curtis noted that she lacked motivation. Plaintiff was also moderately impaired in social functioning.  She had withdrawn from her friends and tended to stay isolated.  However, she denied having difficulty getting along with others.  With regard to appearance and ability to care for personal needs, Plaintiff had a moderate to severe impairment.  She showered only once a month and declined to brush her teeth regularly, get dressed, or care for her hair.  She also reported moderate impairment to concentration, persistence, and pace.  Dr. Curtis diagnosed major depressive disorder, recurrent, moderate; panic disorder with agoraphobia; diabetes, epilepsy, and hypertension; occupational, economic, and psychosocial

12

problems, and a GAF of 62. Her prognosis was fair with appropriate intervention to maximize functioning. (Tr. 264-67)

In a Medical Source Statement, Dr. Curtis opined that Plaintiff had moderate limitations in her ability to make judgments on complex work-related decisions. She had no limitations to her ability to carry out simple instructions and only mild limitations in understanding and remembering simple instructions; making judgments on simple work-related decisions; understanding and remembering complex instructions; and carrying out complex instructions. Further, her ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the work setting was moderately impaired. (Tr. 268-70)

## IV. The ALJ's Determination

In a decision dated August 12, 2010, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. She had not engaged in substantial gainful activity since February 28, 2007, her alleged onset date. Plaintiff's severe impairments included epilepsy, history of chronic low blood pressure; diabetes mellitus, type II; major depressive disorder, recurrent, moderate; and panic disorder with agoraphobia/generalized anxiety disorder. However, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated Plaintiff's impairments under Sections 11.02 and 11.03, pertaining to epilepsy, and Sections 12.04 and 12.06, pertaining to affective disorders and anxiety-related disorders, respectively. (Tr. 16-19)

After carefully considering the record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels. However, she

13

was limited to work involving no climbing of ladders, ropes, or scaffolds; frequent climbing of stairs and ramps; and frequent balancing, stooping, kneeling, crouching, and crawling. In addition, she was limited to unskilled work involving no exposure to heights or moving machinery; only brief contact with others in the workplace; and no rapid or frequent changes in work routine due to reduced tolerance for stress. The ALJ noted the lack of medical evidence of Plaintiff's seizures, her failure to seek psychiatric treatment until after she applied for disability, her infrequent trips to her treating physician, and her non-compliance with treatment. Although Plaintiff was unable to perform any past relevant work, the ALJ determined that, based on her younger age, education, work experience, and RFC, jobs existed in significant numbers in the national economy which Plaintiff could perform. The ALJ noted the VE's testimony that Plaintiff could perform the work requirements of a cleaner, laundry sorter, and packer. Thus, the ALJ concluded that Plaintiff had not been under a disability from February 28, 2007 through the date of the decision. (Tr. 19-27)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or

(3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set

15

forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

The Plaintiff raises one argument in her Brief in Support of the Complaint. She asserts that the ALJ erred by failing to give greater weight to Plaintiff's treating physicians and by according more weight to the consulting physician's opinion. Defendant, on the other hand, maintains that the ALJ properly weighed the medical opinion evidence.

The undersigned finds that the ALJ properly assessed the medical evidence in this case. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic

---

[1] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

In this case, the ALJ relied on the treatment notes of Dr. Nester and Dr. Brady but found these notes to be inconsistent with the medical statements. With regard to Dr. Nester, the ALJ noted that the medical record contained no tests or other objective evidence to support Dr. Nester's diagnoses. Further, the only evidence in the record to support Dr. Nester's findings were physical examinations which were unremarkable and reliant on Plaintiff's subjective reports of symptoms and limitations. The record shows, and the ALJ found, that Plaintiff primarily saw Dr. Nester for pain prescription refills. In addition, Dr. Nester's treatment notes were inconsistent with his Physician's Assessment and Medical Report. Dr. Nester opined that back pain limited Plaintiff's ability to stand, stoop, lift, and sit. However, during office visits, Dr. Nester never restricted Plaintiff's activities and, instead, consistently encouraged Plaintiff to exercise. Thus, the ALJ properly discounted Dr. Nester's opinions rendered in his reports related to Plaintiff's disability claim. See Choate v. Barnhart, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly discredited physician's Medical Source Statement where treatment notes never mentioned restrictions or limitations to the plaintiff's activities).

17

Additionally, nothing in Dr. Nester's treatment notes supports his opinion that Plaintiff suffered 1 to 2 "major" seizures a year. On one occasion, Plaintiff reported having a seizure four days prior to her appointment with Dr. Nester, but she did not seek medical attention right away. In addition, she stated that her last seizure was four years earlier. (Tr. 236) However, Dr. Nester did not perform any examinations or tests to confirm the epileptic seizure diagnosis, and the ALJ properly discredited this opinion. See Nielson v. Barnhart, 88 F. App'x. 145, 147 (8th Cir. 2004) (finding substantial evidence supported the ALJ's decision to discount physician's opinion that plaintiff suffered from seizure disorder where the opinion was not linked to diagnostic test results or examination findings). Further, despite the diagnosis of disabling back pain, Dr. Nester never performed further testing to confirm the diagnosis. In addition, most of Plaintiff's musculoskeltal examinations were normal, with no limitation to range of motion and no deformities. Only two appointments in 2010 showed some reduced range of motion and paraspinal tenderness, and Dr. Nester merely refilled Plaintiff's pain medication prescriptions. (Tr. 289, 301) An impairment that can be controlled by medication cannot be considered disabling. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (citation omitted). Because the medical treatment records were inconsistent with Dr. Nester's Physician's Assessment for Social Security Disability Claim, the ALJ properly refused to give Dr. Nester's opinions controlling weight. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000) (stating an ALJ may discount or disregard a treating physician's opinion where the "treating physician renders inconsistent opinions that undermine the credibility of such opinions . . .") (citation omitted).

Likewise, the ALJ properly discredited Dr. Brady's opinions. Treatment notes revealed complaints of depression and anxiety. However, her mood improved with medication, which Dr.

Brady continued to monitor and change as needed. Plaintiff was also becoming more social and more active. In his assessments, however, Dr. Brady stated that Plaintiff had no ability to deal with work stresses or concentrate and that her conditions prevented her from working. Despite these opinions, he also stated that she had the ability to relate to and interact with others, as well as follow simple job instructions. Dr. Brady noted Plaintiff's continued improvement and an ability to return to part-time work by November 2010. Because of the inconsistencies between the treatment notes and Dr. Brady's opinion that Plaintiff was unable to work, as well as internal inconsistencies in the assessments, the ALJ properly gave that opinion little weight. See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (upholding the ALJ's determination that the treating physician's opinions were not entitled to controlling weight because they were inconsistent with and unsupported by the medical record, including the doctor's own treatment notes).

Plaintiff argues, however, that the ALJ incorrectly gave more weight to the consultative examiner, Dr. Curtis, in finding Plaintiff not disabled. However, "[a]n ALJ may accord greater weight to a consulting physician only where the one-time medical assessment is supported by better or more thorough evidence or where a treating physician renders inconsistent opinions." Turner v. Astrue, No. 4:08-CV-107 CAS, 2009 WL 512785, at *11 (E.D. Mo. Feb. 27, 2009) (citation omitted). Here, the ALJ properly found that the opinions of Dr. Brady and Dr. Nester were inconsistent with treatment notes. Thus, he did not give those opinions controlling weight. However, Dr. Curtis provided a thorough mental status exam and found that Plaintiff's social and occupational functioning were only moderately impaired. These findings were consistent with the medical evidence in the record. Substantial evidence supports an ALJ's determination to give treating physicians' opinions less weight where a one-time medical evaluation and medical evidence supported the ALJ's disability

19

decision. Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007). Therefore, the ALJ did not err in discounting the opinions of Drs. Brady and Nester and according greater weight to the opinion of Dr. Curtis. Thus, the Court will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of September, 2012.